**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NOBLE SUPPLY & LOGISTICS, LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11369 (CTG)<br><br>**Related Docket Nos. 325, 327** |
| NOBLE SUPPLY & LOGISTICS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DEFENSE LOGISTICS AGENCY,<br><br>Defendant. | Adv. Proc. No. 26-50885 (CTG)<br><br>**Related Docket Nos. 3, 17, 23** |

**MEMORANDUM OPINION**

Consider a circumstance in which Party A believes that it holds a claim against Party B worth as much as $1 billion. Party B, meanwhile, has delivered $15 million in goods to Party A, and payment is due. As a practical matter, Party A might refuse payment and sue on its larger claim, leaving Party B to counterclaim for the price of the goods. Once the parties' obligations were established and liquidated, setoff might permit payment of only the net balance. But the prospect of an eventual setoff does not itself establish a present right to withhold payment.

The Supreme Court described setoff in 1913 as the right "which one party has against another to use his claim in full or partial satisfaction of what he owes to the

other."[1] That mechanism avoids "the absurdity of making A pay B when B owes A."[2] Section 553 of the Bankruptcy Code generally preserves qualifying nonbankruptcy setoff rights.[3]

This case presents that problem in concrete terms. The United States asserts substantial claims against Noble arising from alleged bid rigging and other alleged misconduct.[4] The Government anticipates that its claims may exceed $1 billion. Noble, in turn, seeks payment of approximately $14.6 million for goods and services it says it provided to the Defense Logistics Agency.[5] Noble is pursuing a sale of substantially all its assets, and the sale proceeds may leave little or nothing for unsecured creditors. The Government's concern that payment will impair its ability to recover on its claims is therefore understandable.

That concern does not, however, establish the legal entitlement the Government asserts. Under the ordinary common-law rule, the Government's disputed and unliquidated damages claims do not provide a present right of setoff. Although language in *United States v. Munsey Trust Co.* might support an argument for broader Government authority, the Government has not advanced that argument and the Court does not decide it.[6] On the arguments and record presented, the

[1] *Studley v. Boylston Nat'l Bank of Boston*, 229 U.S. 523, 528 (1913).

[2] *Id.*

[3] *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995).

[4] Debtor Noble Supply & Logistics, LLC is referred to as the "debtor" or as "Noble."

[5] The Defense Logistics Agency is referred to as the "DLA."

[6] 332 U.S. 234 (1947).

Government has not established an interest entitled to adequate protection. The particular relief it requests—an allowed superpriority administrative claim and priority over existing secured creditors—would also be unavailable for independent reasons.

The absence of an established setoff right does not mean that every amount Noble seeks is subject to turnover. Section 542(b) of the Bankruptcy Code requires payment of qualifying matured debts; it does not provide a means to adjudicate an underlying contract dispute. Section 106(a) expressly waives sovereign immunity for a proper turnover action. But the Court concludes that the Tucker Act does not waive immunity for Noble's separate breach-of-contract action in this forum.

Applying those principles to the existing summary-judgment record, the Court concludes that Noble has established matured payment obligations totaling $8,493,160.09. The Government's objections to those obligations do not identify a genuine dispute concerning Noble's performance. The remaining amounts involve unresolved disputes about delivery to the contractually required destinations and are not properly recoverable through turnover. The unresolved contract claims will be dismissed without prejudice.

Part I of this Memorandum Opinion addresses the Government's request for adequate protection. Part II grants relief from the automatic stay so that the Government may exercise whatever nonbankruptcy termination rights it possesses, without adjudicating those rights. Part III addresses turnover and sovereign immunity. Part IV applies that framework to the 108 deliveries at issue.

## Factual and Procedural Background

Noble was in the government contracting business. It filed these bankruptcy cases on August 31, 2026. The first-day declaration explains that the company was the fifth-largest prime vendor to the DLA.[7] The declaration also discloses that the debtor was subject to various governmental investigations.[8] In December 2024, the DLA elected not to renew one of the company's key government contracts.[9] The DLA further elected not to renew various other contracts earlier this year.[10] Following negotiations with its various lenders, the debtor filed for chapter 11 with a plan to sell its business assets.[11] This Court has granted three interim orders authorizing the debtor to use the prepetition lenders' cash collateral in order to finance the bankruptcy case.[12] The Court has also entered an order authorizing the debtors to undertake a sale process, which contemplates a sale in late November.[13]

The debtors' budget, however, contemplated that the DLA would continue to make payments, as it had in the ordinary course of business, for various goods and services the debtor had provided or would continue to provide under contracts that

---

[7] Main Case D.I. 15 ¶ 8.

[8] *Id.* ¶ 21.

[9] *Id.* ¶ 45.

[10] *Id.* ¶ 48.

[11] *Id.* ¶¶ 58–64.

[12] Main Case D.I. 73, 218, 338.

[13] Main Case D.I. 219.

had not been terminated. On September 11, 2026, however, the debtor filed an emergency motion to compel the DLA to perform under the parties' contracts.[14]

In opposing that motion, the Government argued that the debtor owed it up to approximately $3.2 million, and that it had imposed an administrative freeze on all payments to Noble "while the DLA evaluates amounts Noble owes or may owe to the United States for claims arising prepetition."[15]

This Court found that to be unlawful.[16] The Court explained that the Supreme Court's decision in *Strumpf* permits a creditor temporarily to refuse to pay a debt that is subject to setoff in order to permit the creditor to seek stay relief to effect a setoff. The evidentiary record before the Court, however, indicated that the most that the Government contended it was owed was approximately $3.2 million, but that it had placed an administrative freeze on nearly $7 million in payables. Moreover, the record made clear that other amounts would become due that would fully protect the right of setoff up to the full $3.2 million that the Government alleged was due. For that reason, the Court held that the Government could set off the amount that Noble agreed it owed the Government (approximately $600,000) and ordered that it pay the balance (approximately $6.4 million) to Noble.[17]

---

[14] Main Case D.I. 102.

[15] Main Case D.I. 124 ¶ 22.

[16] Main Case D.I. 151.

[17] *Id.* ¶ 7.

On October 6, 2026, Noble filed the above-captioned adversary proceeding against the DLA.[18] The complaint contained two counts: the first sought turnover of amounts due for pre-termination delivery orders under § 542 of the Bankruptcy Code while the second sought, in the alternative, breach of contract damages.[19] That same day, the debtor moved for summary judgment and to shorten time to have the summary judgment motion heard no later than October 30, 2026.[20] The motion to shorten alleged that the DLA was withholding payment on more than $14.5 million in goods that had been delivered and that would have typically been paid in the ordinary course.[21] The motion further represented that without receipt of the funds alleged to be due, the "Debtors will likely exhaust their liquidity during the first week of November 2026."[22] After a hearing held the next day, the Court entered an order shortening time and providing that the motion for summary judgment would be heard on October 28, 2026.[23]

On October 13, 2026, the Government filed motions for relief from stay and for adequate protection (in the main case), both set for hearing on October 28, 2026.[24] The stay relief motion sought relief from the stay to terminate certain agreements in accordance with their terms, noting that under the rationale of the Third Circuit's

---

[18] D.I. 1.

[19] *Id.*

[20] D.I. 3; D.I. 6.

[21] D.I. 6 at 2.

[22] *Id.* at 7.

[23] D.I. 15.

[24] Main Case D.I. 325; Main Case D.I. 327.

decision in *West Electronics*, government contracts cannot be subject to assumption and assignment without the Government's consent.[25]

The motion for adequate protection stated that the Government had, after this Court had ruled that the administrative freeze it had imposed violated the automatic stay, obtained orders that partially lift seals in two *qui tam* actions pending against Noble in U.S. District Courts for the Districts of New Mexico and Massachusetts. The adequate protection motion asserts that the damages alleged in those actions is "no less than $266 million," and counsel represented at the October 28, 2026 hearing that the Government may seek as much as $1 billion in damages. It argued that these claims will lead to fixed, prepetition debts owed to the United States and that it therefore held rights of setoff that were entitled to adequate protection. And the Government sought superpriority status for its right of adequate protection under § 507(b) of the Bankruptcy Code and the creation of a "reserve" of the debtors' sale proceeds that would effectively give the Government priority over the debtor's secured creditors who assert that they hold liens on those proceeds.

On October 20, 2026, the Government moved to dismiss the adversary proceeding both on sovereign immunity grounds and on the merits.[26] On October 21, 2026, the Government cross-moved for summary judgment, making similar

[25] Main Case D.I. 325 at 6 (citing *In re West Elec., Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988).

[26] D.I. 17.

arguments.[27] The Government sought to shorten notice on both of its motions so that they could also be heard on October 28, 2026.[28] The Court granted that motion.[29]

At the October 28, 2026 hearing, the Court indicated that it was inclined to: (a) deny the motion for adequate protection; (b) grant the motion for relief from stay; (c) consider the claim for turnover to the extent the debtor can establish the absence of any dispute of material fact with respect to a matured debt due from the Government; and (d) dismiss the remaining claim for breach of contract on sovereign immunity grounds. The Court then proceeded to consider the merits of the summary judgment record.

The core of the dispute between the parties related to various positions taken regarding 108 deliveries allegedly made by the debtor for which the Government has withheld payment. At the conclusion of that hearing, however, the Court determined that it required supplemental briefing to sort through the 108 deliveries to determine whether, in light of the disputes raised by the Government, the debtor was entitled to turnover. And the Court made clear that the supplemental briefing was limited to clarifying and categorizing evidence already in the summary judgment record. It was not an invitation to submit evidence that had not been previously included in the existing summary judgment record. The Court directed the parties to provide those supplemental briefs by October 30, 2026, with a view towards having the Court issue

[27] D.I. 23.

[28] D.I. 20.

[29] D.I. 28.

a ruling on November 2, 2026. Both parties filed those supplemental letter briefs.[30] This Memorandum Opinion is intended to explain the Court's rulings and the reasons for the orders it will enter.

## Jurisdiction

The claims for adequate protection, stay relief, and turnover are all claims that arise under the Bankruptcy Code and thus fall within the "arising under" jurisdiction provided in 28 U.S.C. § 1334(b). These claims are core matters as to which the Court may enter final judgment. The debtor's claim for breach of contract would ordinarily fall within § 1334(b)'s "related to" jurisdiction (and would not be a core proceeding). Because, however, as described below, the Court concludes that this claim is barred by federal sovereign immunity, which is a jurisdictional defense, the Court lacks subject-matter jurisdiction over that claim.

## Analysis

The Government's motion for adequate protection and its motion for relief from the automatic stay are both contested matters that are typically resolved based on the evidentiary record established at the hearing. While both parties were prepared to present evidence with respect to these matters, the Court concluded, based on the briefing, that neither turned on a disputed question of fact and both were properly resolved as a matter of law.

In the adversary proceeding, the Government's motion to dismiss requires the Court to determine whether the complaint's factual allegations are sufficient to state

[30] D.I. 41 (Noble letter brief); D.I. 42 (Government letter brief).

the claims alleged. Giving effect to the Supreme Court's decisions in *Iqbal* and *Twombly*, the Third Circuit has set forth a two-step analysis for a court's consideration of a motion to dismiss.[31] *First*, the court should separate the factual and legal elements of a claim, accepting all well-pleaded facts as true while disregarding any allegations that are merely conclusory. *Second*, the court is to assess whether the facts alleged are sufficient to show a plaintiff has a plausible claim for relief.[32]

The cross-motions for summary judgment are controlled by Civil Rule 56. The entry of summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] A court must draw all reasonable inferences in the light most favorable to the non-moving party but shall not make credibility determinations nor weigh the evidence.[34] The role of the court is to assess the record evidence and determine whether it would permit a reasonable finder of fact to rule in favor of the non-moving party.[35]

## I. The Government has not established an entitlement to adequate protection, and the particular relief it requests is unavailable.

The Government's request for adequate protection is unsuccessful for several independent reasons. The basic doctrinal framework is that § 363(e) of the

---

[31] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–211 (3d Cir. 2009).

[32] *Fowler*, 578 F.3d at 210–211.

[33] Fed. R. Civ. P. 56(a) (made applicable by Fed. R. Bankr. P. 7056).

[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[35] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986).

Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased … by the trustee, the court … shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."[36] Section 361, in turn, explains that when adequate protection is required under § 363, it may be provided by (1) requiring the trustee to make cash payments; (2) granting the holder of an interest in property an additional or replacement lien; or (3) "such other relief … as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."[37]

**A. A right of setoff is properly treated as an interest in property.**

The starting point of the analysis is whether the Government has an interest in property of the estate. The text of the Bankruptcy Code suggests that a party holding a right of setoff in effect holds an interest in estate property. Section 506(a) provides that an "allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of the creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff."[38]

In fairness, the statutory text does admit of a contrary argument. The statutory language itself could be read to say that there are two ways a creditor can end up with an allowed secured claim: either (a) the creditor holds a lien and thus an

[36] 11 U.S.C. § 363(e).

[37] 11 U.S.C. § 361. *See also United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204 (1983) ("At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor.").

[38] 11 U.S.C. § 506(a).

interest in estate property or (b) the creditor has a right of setoff. On that (textually plausible) reading, § 363(e) affords adequate protection only to creditors in category (a), not those in category (b). The holder of a right of setoff, on this view, would therefore not be entitled to adequate protection at all.

But even if the words of the statute could be read this way, the Third Circuit's treatment of setoff under § 363 supports treating it as an interest in property. Specifically, the Third Circuit held in *Folger Adam* that property could be sold, under § 363(f), free and clear of a party's unexercised right of setoff.[39] The natural implication of that holding is that such a right is an interest in the property being sold. That inference is reinforced by the relationship between the two subsections: § 363(f) authorizes the sale free and clear of an interest, while § 363(e) provides protection for an interest affected by the sale.

Treating a right of setoff as an interest in property also makes sense. We know from § 506(a) that the holder of a valid right of setoff is a secured creditor. It is hard to see why § 363(e) would afford adequate protection to one category of holders of allowed secured claims but not the other.

**B. The general rule is that the holder of a disputed and unliquidated claim does not have a right to setoff.**

Section 553 of the Bankruptcy Code preserves parties' rights of setoff; it does not itself create them. The analysis must therefore begin with the question whether a party holds a right of setoff under applicable nonbankruptcy law. Under the general

[39] *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 262–263 (3d Cir. 2000).

common law rule, a disputed and unliquidated claim for damages cannot be set off against a matured, liquidated debt. The Supreme Court said essentially that in *United States v. Robeson.* "[A] claim for unliquidated damages cannot be pleaded by way of a set-off, in an action between individuals; and the same rule governs in an action brought by the government."[40]

An existing debt that is matured and liquidated may be applied in satisfaction of another debt. But one cannot typically use an unresolved and disputed claim for damages to avoid paying an obligation that has matured and is otherwise due and owing. That is the common law rule in cases that involve private parties. As the Delaware Court of Chancery put it, "[a]t common law, a contingent or unmatured obligation which is not presently enforceable cannot be the subject of set-off or, put differently, there is no right to set-off of a possible unliquidated liability against a liquidated claim that is due and payable."[41] Or as the Nebraska Supreme Court explained, "[m]ost jurisdictions follow the rule that an unliquidated claim cannot be set off against a liquidated claim."[42]

That does not mean that every disagreement about a claim defeats setoff, or that a claim must have been fully liquidated on the petition date. Courts have recognized setoff rights arising from established prepetition obligations even though

---

[40] *United States v. Robeson*, 34 U.S. (9 Pet.) 319, 325 (1835). *See also United States v. Buchanan*, 49 U.S. (8 How.) 83 (1850).

[41] *Post Holdings, Inc. v. NPE Seller Rep LLC*, 2018 WL 5429833, at * 6 (Del. Ch. Oct. 29, 2018) (internal quotations, citations, and brackets omitted).

[42] *Davis Erection Co. v. Jorgensen*, 534 N.W.2d 746, 751 (Neb. 1995) (collecting cases).

payment remained contingent or the amount had not yet been liquidated.[43] Here, however, the Government's claim is disputed as to liability as well as unliquidated in amount. Perhaps, at the end of the day, the Government will establish a very large False Claims Act liability. That possibility, however, does not under ordinary rules give rise to a present right of setoff.

Significantly, the Government fails even to acknowledge this general rule let alone engage with it. Rather, its principal argument is that "the United States maintains an interest in any payments for prepetition goods or services provided by the Debtors to the extent the Debtors owe mutual prepetition debts to the United States. The Debtors concede they are under multiple civil and criminal investigations, which amount to hundreds of millions of dollars in liabilities owed to the United States. Therefore, the United States is entitled to adequate protection of its setoff rights."[44] That argument, however, is simply inconsistent with the body of law described above making clear that the holder of a disputed and unliquidated claim, such as the Government's False Claims Act claim against Noble, is not entitled to setoff. Indeed, in connection with the debtor's prior motion to compel payment when the Government had imposed an administrative freeze, the Court offered to conduct an estimation under § 502(c) to determine an amount that could support the

---

[43] *See In re Elsinore Shore Assocs.*, 67 B.R. 926 (Bankr. D.N.J. 1986) (addressing reimbursement obligations under prepetition letters of credit that were contingent and unliquidated on the petition date).

[44] Main Case D.I. 327 at 2.

Government's asserted setoff right. The Government declined that opportunity, explaining that it was not then seeking to effect a setoff.[45]

The Government neither acknowledges the ordinary rule governing disputed and unliquidated claims nor (as discussed below) argues for a sovereign exception to that rule. Instead, it contends that it need not establish the validity or amount of its claims because it seeks only adequate protection, not to effect a setoff. That distinction, however, fails to address the threshold question whether the Government has established an interest in property entitled to protection. In this Court's prior ruling, the Court noted the Government's right to setoff because Noble acknowledged that the Government held a valid claim for at least approximately $600,000. That is not so here. And because the Government has not established such a claim here, it is not entitled to adequate protection.

### C. While an argument can be made that a different rule applies to the Government as creditor, the Government has not advanced any such argument.

An argument could be made that the Government possesses authority to set off disputed and unliquidated claims notwithstanding the ordinary rule described above. Such an argument would be grounded in the Supreme Court's decision in *Munsey Trust*.[46] There, the Government applied amounts retained under

[45] *Id.* at 1–2 ("The Court also generously offered to conduct an estimation hearing for the limited purpose of determining amounts subject to setoff for the benefit of the United States if it were to seek relief from the automatic stay prior to effectuating a setoff. Such a hearing is not necessary, however, because the United States is not seeking to offset any amounts at this time.")

[46] *United States v. Munsey Tr. Co.*, 332 U.S. 234 (1947).

construction contracts against its claim for damages arising from the contractor's failure to enter into a separate contract. A surety that had paid the contractor's laborers and materialmen asserted a competing entitlement to those retained funds. The Supreme Court held that the Government could apply the funds against its independent claim notwithstanding the surety's asserted rights. Significantly, the Government's claim was neither disputed nor uncertain in amount. The Court stated that it was "undisputed that $6,731.50 is the amount of damages sustained by the government" and later described the Government's demand as an "undisputed claim for damages."[47]

*Munsey* nevertheless contains language suggesting broader federal authority, although the Court had no occasion to decide whether that authority extended to disputed and unliquidated claims. The Court noted that a federal statute authorized the Court of Claims to adjudicate "[a]ll set-offs, counterclaims, [and] claims for damages, whether liquidated or unliquidated," asserted by the Government against a claimant in that court.[48] It then reasoned that this "power given to the Court of Claims to strike a balance between the debts and credits of the government, by logical implication gives power to the Comptroller General to do the same, subject to review by that court."[49]

---

[47] *Id.* at 237, 240.

[48] *Id.* at 239.

[49] *Id.* at 240.

The reference to unliquidated claims, together with the Court's inference of corresponding administrative authority in the Comptroller General, could support an argument that the Government possesses setoff rights broader than those available under the ordinary common-law rule. Whether that reasoning extends to a claim disputed as to liability and wholly unliquidated is less clear, particularly given the undisputed claim actually before the Court in *Munsey*. The Government, however, does not advance that argument here. It cites *Munsey* in support of its common-law setoff rights and invokes the proposition that the "federal government has long possessed the right of offset at common law."[50] It does not contend that *Munsey* supplies an exception to the ordinary rule governing disputed and unliquidated claims. The Court therefore has no occasion to decide whether *Munsey* recognizes such an exception.

**D. Even if the Government were entitled to adequate protection, it would not be entitled to the requested § 507(b) superpriority claim, let alone priority over secured creditors.**

The Government's request for a superpriority claim under § 507(b) would be misplaced even if the Government were entitled to adequate protection. That section provides that if adequate protection has been provided under §§ 362, 363, or 364, and "notwithstanding such protection," the creditor holds a qualifying administrative claim arising from the stay, the use, sale, or lease of the property, or the grant of a

[50] Main Case D.I. 327 at 9.

lien under § 364(d), that claim "shall have priority over every other claim allowable under" § 507(a)(2).[51]

The statutory sequence matters. Section 507(b) provides a remedy when adequate protection previously provided proves inadequate. It does not authorize the Court to leapfrog the provision of adequate protection in the form contemplated by § 361 by granting an allowed superpriority claim as the protection itself. Yet that is what the Government's proposed order would do: grant an "allowed super-priority administrative claim" in an amount equal to qualifying payments by the DLA to Noble.[52] The Government has not established the prerequisites for § 507(b) relief: a failure of previously provided adequate protection and a qualifying administrative claim. It instead seeks an allowed superpriority claim as a means of providing adequate protection for its asserted setoff rights as the DLA makes payments. That request does not satisfy § 507(b)'s requirements.

Moreover, even a properly established § 507(b) claim would not provide the priority the Government seeks over secured creditors. Section 507(b) grants priority over other administrative claims allowable under § 507(a)(2); it does not grant a lien or subordinate existing liens. The Government's proposed order would require the debtor to place the proceeds of its asset sale into a reserve pending liquidation of the asserted superpriority claim. Establishing a reserve would not itself alter the creditors' relative priorities. To the extent the Government seeks payment from those

[51] 11 U.S.C. § 507(b).

[52] Main Case D.I. 371-1 at 2.

proceeds ahead of creditors holding valid liens on them, § 507(b) supplies no authority for that relief. The Government identifies no other authority and acknowledged at argument that it had none. Its request will accordingly be denied.

## II. The United States is entitled to relief from the automatic stay to exercise its nonbankruptcy rights.

The Government is on stronger footing regarding its motion for relief from the automatic stay to exercise its rights under the parties' various agreements.[53] The debtors do not dispute that they cannot assume or assign the contracts at issue without the Government's consent, which they recognize will not be forthcoming.[54] That is itself sufficient cause under § 362(d)(1) to lift the stay to permit termination (to the extent permitted by the agreements). Indeed, the debtors' opposition to stay relief is quite narrow, arguing only that they have already completed performance by delivering all of the goods with respect to certain of the orders that the Government now seeks to terminate.[55] Where there is nothing left to terminate, the debtors argue, the Government should not be granted stay relief to send termination letters.

But as the Government points out in its reply, an order granting relief from the stay would merely authorize the Government to exercise its nonbankruptcy rights, whatever those rights may be. It does not adjudicate the metes and bounds of those rights.[56] The debtors' rights to argue that certain orders have been fully

---

[53] Main Case D.I. 325.

[54] *See generally* 11 U.S.C. § 365(c); *West Elec.*, 852 F.2d at 83–84.

[55] Main Case D.I. 363 at 2.

[56] Main Case D.I. 392 at 2.

performed, such that there is nothing left to terminate, are therefore preserved. With that understanding, the Court will grant the motion for relief from the automatic stay.

## III. The debtor is entitled to turnover of amounts that it can show, as a matter of law, have matured and are due and owing; sovereign immunity otherwise precludes this Court from entertaining the debtor's claim for breach of contract.

As an initial matter, it is settled law that "sovereign immunity is jurisdictional in nature and deprives courts of the power to hear suits against the United States absent Congress's express consent."[57] Accordingly, Noble's action against the DLA must be dismissed for lack of jurisdiction unless Noble can point to a federal statute in which Congress waives federal sovereign immunity and consents to being sued. Noble points to two such statutes, § 106(a) of the Bankruptcy Code with respect to its turnover count and the Tucker Act with respect to its breach of contract claim. As described below, the debtor is right that § 106(a) provides a waiver applicable to its turnover count. But this Court concludes that the Tucker Act waiver does not extend to permit the Government to be sued in bankruptcy court on a claim for breach of contract.

### A. Because § 106(a) waives sovereign immunity for claims of turnover, the debtor may seek turnover against the Government.

Section 542(b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable

[57] *United States v. Miller*, 604 U.S. 518, 527 (2025) (internal quotations omitted).

on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."[58] In addition, § 106(a)(1) contains an express waiver of sovereign immunity for claims arising under § 542 of the Bankruptcy Code.

In light of this clear statutory language, if the debtor establishes that amounts due to it from the Government are within the scope of § 542(b), then the Government "shall pay such debt to … the trustee" unless it is subject to setoff. And as described in Part I of this Memorandum Opinion, the Government has not established a right of setoff against the amounts at issue here.

The Government argues that "Section 106 of the Bankruptcy Code provides no waiver because it does not reach contract claims, however labeled."[59] That argument, however, fails to distinguish between enforcing a matured contractual debt through turnover (which § 542(b) expressly authorizes) and adjudicating an underlying claim for breach of contract (which is not permitted).

As described below, the Court agrees that the debtor cannot litigate an ordinary breach-of-contract claim against the Government in this Court merely by labeling it turnover. But the contractual origin of a payment obligation does not exclude that obligation from § 542(b). Section 542(b)'s reference to debts that are "matured, payable on demand, or payable on order" readily encompasses contractual payment obligations, including obligations under promissory notes.

---

[58] 11 U.S.C. § 542(b).

[59] D.I. 19 at 2.

Section 106(a)(1) expressly waives sovereign immunity with respect to § 542. The relevant question is therefore whether the debtor has established a claim under § 542(b), not whether the debt originated in a contract. The waiver does not dispense with any requirement of turnover or create a general right to litigate contract claims against the Government. But where the requirements for turnover under § 542(b) are satisfied, the contractual source of the debt does not defeat the express waiver.

### B. Noble must establish its entitlement to turnover under § 542(b), rather than merely assert a disputed claim for breach of contract.

Section 542(b) requires payment of a debt that is property of the estate and is "matured, payable on demand, or payable on order," subject to the statutory exception for setoff.[60] The availability of turnover therefore depends on satisfaction of those requirements, not merely on the debtor's characterization of its action. A contractual obligation may satisfy the statute. But the fact that the estate owns a cause of action for breach of contract does not itself establish that the defendant owes a debt presently subject to turnover. Indeed, the Third Circuit has made plain that a "garden variety contract claim" cannot be converted to a "core proceeding" simply by calling it a turnover action.[61]

Courts accordingly distinguish the enforcement of a payment obligation properly subject to turnover from the adjudication of an underlying contract dispute. As the Eleventh Circuit explained, "[t]urnover proceedings are not to be used to

[60] 11 U.S.C. § 542(b).

[61] *See Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir. 1990).

liquidate disputed contract claims."[62] The D.C. Circuit likewise recognized that a debtor "cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."[63]

The relevant distinction is thus not between contractual and noncontractual obligations, but between a debt satisfying § 542(b) and an unresolved contract claim that the debtor seeks to establish through litigation. Section 106(a)'s waiver permits the Court to enforce the former against the Government; it does not transform the latter into a claim arising under § 542. Noble must therefore establish the statutory predicates for turnover. It cannot obtain the benefit of the turnover waiver merely by attaching that label to its breach-of-contract claim.

That much is perhaps simple enough to articulate and is common ground between the parties. The harder issue is distinguishing a genuine turnover claim, notwithstanding the obligor's objection to payment, from an underlying contract dispute that cannot be adjudicated through turnover. The Court starts with the premise that it cannot be the case that turnover is unavailable whenever the party against which turnover is sought stands up and says "I dispute the debtor's claim" or "I contend that the debt is unmatured." For the turnover statute to have any teeth at all, it must imply that the Court has some means by which it examines the alleged "dispute" and makes a decision whether it is the kind of dispute that renders turnover unavailable. But neither the parties' briefs nor this Court's own research has turned

---

[62] *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990).

[63] *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991). *See also In re DHP Holdings II Corp.*, 435 B.R. 264, 271 (Bankr. D. Del. 2010) (Walrath, J.).

up much authority that identifies a standard that a court should apply in making that assessment.

During the October 28, 2026 argument, the Court asked the parties about their position on this question. The Court posited that one approach could be to ask whether the factual record in support of the elements of turnover is established in a way that would support the entry of summary judgment for the debtor. The summary-judgment standard provides a familiar means of distinguishing an unsupported objection from a genuine factual dispute requiring adjudication. Its inquiry—whether "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law"—also fits the distinction drawn in *Inslaw* and *Charter* between enforcing an established payment obligation and liquidating a disputed contract claim.[64]

In response to the Court's questions during the October 28 argument, neither party identified authority prescribing a different standard or objected to the Court's proposed approach. The Court will accordingly use the summary-judgment standard in this case to test whether the Government's asserted disputes prevent Noble from establishing a matured payment obligation under § 542(b). Where the record establishes the statutory elements as a matter of law, the Government's characterization of the obligation as disputed does not defeat turnover. Where resolution instead requires adjudication of an underlying dispute over contractual

---

[64] *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) ("Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.").

performance, the authorities discussed above preclude using turnover as a substitute for that contract litigation. The Court need not and does not decide whether the same approach supplies the appropriate boundary in every turnover proceeding.

### C. To the extent the debtor holds a disputed claim for breach of contract, federal sovereign immunity bars this Court from hearing the claim.

For the reasons described in Part III.B, the Court will (in Part IV) apply the summary judgment standard to determine which (if any) of the amounts that Noble claims are due satisfy the standard of § 542(b) and are thus subject to turnover. That leaves the question of how to address those amounts that are the subject of a genuine dispute. Noble's position is that this Court has related-to jurisdiction over such claims and that it may adjudicate them. In support of that position, Noble points to the Federal Circuit's decision in *Quality Tooling*, which suggests that the waiver of federal sovereign immunity contained in the Tucker Act is sufficient to permit the United States to be sued on a breach of contract action in bankruptcy court.[65]

Although language in *Quality Tooling* supports Noble's position, this Court finds the Ninth Circuit's contrary construction of the Tucker Act to be more consonant with the statutory language. The Ninth Circuit authority also better accords with the Supreme Court's instruction, emphasized in recent decisions, that ambiguities concerning the scope of a sovereign-immunity waiver must be resolved in favor of the Government.

---

[65] *Quality Tooling, Inc. v. United States*, 47 F.3d 1569 (Fed. Cir. 1995).

In the Tucker Act, the United States waives its sovereign immunity and consents to being sued on breach of contract and other actions. The statute provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.[66]

That is, without question, an express waiver of sovereign immunity for suit "upon any express or implied contract." But the waiver applies by its terms to actions brought in the Court of Federal Claims, which is granted subject-matter jurisdiction over such actions.

*Quality Tooling* reads that statutory language quite expansively. There, the Army terminated a government contract with Quality Tooling, which then filed for bankruptcy while its contract action was pending in the Court of Federal Claims. Following transfer of the bankruptcy case to the Northern District of Alabama, the contract action was removed to the district court sitting in bankruptcy.[67] The Government moved to have the case transferred back to the Court of Federal Claims, which it contended is the only court with jurisdiction over the action. But the district court denied the motion. The Government appealed to the Federal Circuit, which by statute has jurisdiction over all interlocutory appeals from the grant or denial of a motion to transfer a case from a district court to the Court of Federal Claims.[68]

---

[66] 28 U.S.C. § 1491(a)(1).

[67] *Quality Tooling*, 47 F.3d at 1571.

[68] *See* 28 U.S.C. § 1292(d)(4).

The Federal Circuit, however, rejected the Government's argument. That court found that the broad grant of subject-matter jurisdiction in § 1334(b) reflected a congressional intent "to give the district court sitting in bankruptcy plenary authority over the bankrupt's estate and all claims by or against it."[69] The court went on to conclude that "[t]he Bankruptcy Act is thus a codification of the comprehensive authority possessed by bankruptcy courts over bankrupt estates, and on its face includes the disputed contract rights at issue here."[70]

The notion that a claim by the debtor-in-possession against a contractual counterparty on a prepetition claim for breach of contract would fall within the "related-to" jurisdiction of § 1334(b) would not normally be a controversial one. Such a claim has an effect on the bankruptcy estate and thus falls within the court's jurisdiction.[71]

That conclusion by itself, however, would not appear to address the question whether the breach of contract action, when asserted against the United States, is barred by federal sovereign immunity. On that question, the Government took the position that the Tucker Act waiver of sovereign immunity applied only in the Court of Federal Claims. "The Government argues that the Tucker Act waiver of sovereign immunity is limited to its jurisdictional terms: the Government has consented to be sued on a contractual matter *only* in the Court of Federal Claims. That the

---

[69] *Quality Tooling*, 47 F.3d at 1573.

[70] *Id.*

[71] *See Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984).

Government has waived its immunity in the Court of Federal Claims does not imply that the Government has waived its immunity in other courts."[72]

*Quality Tooling*, however, suggests otherwise, holding that the waiver of sovereign immunity in the Tucker Act is not specific to the suits filed in the Court of Federal Claims. "The question is the narrow one of whether Congress, having granted Quality the right to sue the United States on this claim, and having in other legislation granted to two federal courts jurisdiction over such claims, intended the right to sue to be applicable in both federal courts which have jurisdiction."[73] The Federal Circuit answered that question affirmatively, finding no indication that Congress intended the waiver to apply exclusively in the Court of Federal Claims. In its view, there was not "anything in the governing legislation to suggest that we are to read Congress' intention as preferring the one court to the exclusion of the other in adjudicating this claim."[74]

The Ninth Circuit has rejected that analysis. In *McGuire v. United States*, that court, after describing the reasoning of *Quality Tooling*, concluded that it "cannot agree that the Tucker Act generally waives sovereign immunity for suits outside the Court of Federal Claims."[75] Rather, relying on the language of the Tucker Act and

---

[72] *Quality Tooling*, 47 F.3d at 1574.

[73] *Id.* at 1577.

[74] *Id.* While the court found that the Tucker Act's sovereign immunity waiver did not bar the suit from proceeding in district court, it vacated the order denying the motion to transfer to the Court of Federal Claims, holding that the court should consider whether that court's specialized expertise in government contract disputes provided a reason to transfer the case as a prudential matter. *Id.* at 1578–1579.

[75] *McGuire v. United States*, 550 F.3d 903, 912 (9th Cir. 2008).

the negative inference it drew from the more focused waiver of sovereign immunity in bankruptcy under § 106(a) of the Bankruptcy Code, it held that the suit against the United States should be transferred to the Court of Federal Claims.

While this Court is reluctant to disagree with the Federal Circuit on a question of the meaning of the Tucker Act, a question on which that Court has substantial expertise, the Court finds *McGuire*'s construction of the Tucker Act more persuasive. That construction follows the statutory language and accords with the Supreme Court's repeated instruction—most recently reiterated in *Miller*—that ambiguities concerning the scope of a sovereign-immunity waiver must be resolved in favor of the Government.

The question in *Miller* was whether § 106(a), which contains an express waiver of sovereign immunity for § 544 claims, allowed a chapter 7 trustee to bring suit against the Government to recover taxes that a corporate debtor paid for the benefit of its principals.

Section 544(b) permits a trustee to avoid a transfer that an actual unsecured creditor could avoid under applicable nonbankruptcy law. *Miller* held that § 106(a)'s waiver for the federal § 544(b) action did not also waive immunity for the underlying state-law claim necessary to satisfy that provision. The trustee therefore could not use the bankruptcy waiver to eliminate the sovereign-immunity defense that would have defeated the actual creditor's action outside bankruptcy.

In reaching that conclusion, the Supreme Court emphasized that any ambiguity in the reading of the applicable statutory text needed to be resolved against

a finding of waiver of sovereign immunity. Even "if the language and logic of § 544 and § 106(a) permitted respondent's broad reading of the sovereign-immunity waiver, we note further that our precedents would still foreclose that reading."[76] That is so because a court "must construe any ambiguities in the scope of a waiver in favor of the sovereign."[77]

That statement tilts strongly in favor of the reasoning of *McGuire* and against that of *Quality Tooling*. Indeed, *McGuire* relied heavily on the principle that "the Government's consent to be sued must be construed strictly in favor of the sovereign, and not enlarged … beyond what the language requires."[78] Here, the Bankruptcy Code expressly waives sovereign immunity for claims under certain provisions of the Code. It does not contain a general waiver for claims arising under a contract. Rather, § 106(b) contains a waiver for counterclaims arising out of the same transaction or occurrence when the Government files a proof of claim, and § 106(c) contains a waiver that permits the exercise of setoff rights. Those provisions do not foreclose reliance on a waiver supplied by another statute. They do, however, confirm that § 1334(b)'s jurisdictional grant does not itself supply a general waiver of sovereign immunity. If anything, these specific provisions make clear that Congress did *not* intend to provide a general waiver of sovereign immunity in bankruptcy for any claim that arises under a Government contract. The Court accordingly concludes

[76] *Miller*, 604 U.S. at 532.

[77] *Id.* (internal citations and quotation omitted).

[78] *McGuire*, 550 F.3d at 912 (quoting *United States v. Nordic Village*, 503 U.S. 30, 34 (1992)).

that the Tucker Act must be read to mean what its language most naturally provides—that the waiver of sovereign immunity it grants is limited to suits in the Court of Federal Claims. For that reason, unlike the turnover action for which sovereign immunity is waived, the debtor's breach of contract action brought against the United States will be dismissed for lack of jurisdiction on account of federal sovereign immunity.[79]

## IV. The undisputed record establishes that the debtor is entitled to turnover of approximately $8.5 million; the remaining $6 million are genuinely disputed and therefore are not subject to turnover.

The remaining question is which of the 108 pre-termination delivery orders give rise to payment obligations that Noble has established are matured and subject to turnover under § 542(b). It bears noting that the Court rejects the Government's contention that a dispute as to any delivery means that all amounts are disputed and that turnover therefore cannot be granted as to any delivery. As the Government correctly explained in its motion for stay relief, each "Delivery Order is a self-contained purchase."[80] The stay relief motion adds that the "price of one Delivery Order does not depend on other orders, and a missed delivery under one order is not, by itself, a breach of another order."[81] The logic of that position is that the question

---

[79] The Court separately raised with the parties the question whether they would prefer such counts to be transferred to the Court of Federal Claims rather than dismissed. They indicated that their (joint) preference was that those portions of the complaint be dismissed without prejudice so that they may be filed afresh in the Court of Federal Claims. That approach is agreeable to the Court.

[80] Main Case D.I. 325 at 3.

[81] *Id.*

of whether the debtor is entitled to turnover must be examined on a delivery-by-delivery basis.

Noble's position is set forth in a declaration filed by Robert Albergotti, who is the debtor's chief transformation officer.[82] He explains that "Noble delivered certain goods to the contractually agreed-upon destinations or provided services to the appropriate party through the date of the DLA's purported termination on August 27, 2026, and the Government retained possession of such goods."[83] For some of those goods, "a representative of the Government signed a receiving report."[84] For others, Noble does not have a signed receiving report, but has "obtained proof of delivery from a shipper or freight forwarder."[85] In addition, Albergotti states that the "Government has not raised any defects or nonconformities with respect to the goods and services associated with the Pre-Termination Delivery Orders."[86] Nevertheless, Albergotti states, "the DLA has refused to validate the proof of delivery or provision of services rendered for $14,566,268.02 of Pre-Termination Delivery Orders, thereby preventing Noble from invoicing the DLA for such orders."[87] Albergotti's declaration includes an exhibit that lists the 108 deliveries that he says give rise to the approximately $14.6 million receivable, indicating for each delivery, among other things, the invoice

[82] D.I. 5.

[83] *Id.* ¶ 17.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

number, a description of the goods and services provided, the date of delivery, and the amount he contends is due.[88]

In response, the Government attaches to its brief a declaration submitted by John S. Cuorato, Jr., of the DLA.[89] Cuorato helpfully worked off of Albergotti's chart of the 108 deliveries, adding additional columns to provide further information, such as the date when the Government received proof of delivery and whether that proof of delivery was in a form that was acceptable to the Government.[90] He also asserts that for some of the deliveries, the location of the delivery differed from the location that was contractually agreed.[91]

At bottom, in view of the undisputed facts on which the parties' declarations agree, the disputes between them seem to boil down to a handful of issues. *First*, the Government contends that it has not formally "accepted" delivery of any of the 108 deliveries. For that reason, Noble cannot invoice the Government using the electronic system through which the DLA is invoiced by vendors. Because the Government contends that this formal acceptance must occur in order for a debt to mature, it asserts that turnover is not available for any of these amounts.

*Second*, the Government states that there are some deliveries for which proof of delivery was provided after the date of termination. The Government contends

[88] D.I. 5-1 at 202–205.

[89] D.I. 19-3.

[90] *Id.* at ¶¶ 9–17.

[91] *Id.* ¶ 12.

that it is not required to accept a proof of delivery that comes after it terminated the contract.

*Third*, the Government contends that for certain of the deliveries, the proof of delivery provided by Noble was not acceptable to the DLA. The Government does not, however, offer reasons why those proofs of delivery were not acceptable.

And *fourth*, the Government contends that certain of the goods were delivered to locations that differed from those specified in the parties' contract.

For the reasons set forth below, the Court concludes that: (1) a naked assertion that the Government will not accept delivery, without any reason offered for its refusal, does not prevent the debt from maturing; (2) while the Government may not be required to accept delivery of goods provided after the termination date, where Noble delivered the goods before termination, nothing about the fact that the proof of delivery was received afterwards prevents the Government's obligation from maturing; (3) to the extent the DLA has simply announced that proof of delivery is not acceptable, but has failed to offer a reason or rationale in support of its conclusion, the doctrine of constructive acceptance applies, and the obligation to pay those invoices has accordingly matured; and (4) to the extent Noble cannot demonstrate on the existing summary-judgment record that it has delivered the goods to a contractually agreed location, a material disputed fact renders turnover unavailable.

Applying these principles, the Court concludes that Noble holds a debt of $8,493,160.09 from the DLA that is matured and subject to turnover. The remaining amounts Noble seeks give rise to genuine contractual disputes such that turnover is

unavailable. Exhibit A to this Memorandum Opinion is a chart that categorizes each of the 108 deliveries in light of this analysis. Exhibit B to this Memorandum Opinion is an explanation for that categorization.

### A. The Government cannot prevent a debt from maturing simply by refusing to "accept" delivery without providing a reason.

The Government takes the position that its acceptance of goods shipped is "an affirmative act" and that unless and until it does so, no obligation can mature.[92] In support of that proposition, it relies on the Federal Circuit's decision in *M.C. & D. Capital Corporation*.[93] There, the Army Corps of Engineers entered into an agreement for the installation of a rubber membrane roof and underlying rigid insulation on the roofs of four buildings containing sophisticated and sensitive electronic defense equipment. The applicable contract expressly stated the Government's possession or use of the work "shall not be deemed an acceptance of any work under the contract."[94] The work, however, was deficient. "[S]erious defects in construction appeared, involving numerous breaches of the roofs' water-tight barriers due to peeling patches, as well as other defects in workmanship."[95] The Government accordingly terminated the contract for default.

The Federal Circuit found that the Government had not finally accepted the work. In view of the express provision in their contract stating that possession is not

[92] D.I. 42 at 3.

[93] *See M.C. & D. Cap. Corp. v. United States*, 948 F.2d 1251, 1255–1256 (Fed. Cir. 1991).

[94] *Id.* at 1255.

[95] *Id.* at 1254.

acceptance and the termination on account of specific defects in the work, the court found it "difficult to understand MC & D's argument that the Government's taking possession of the work constituted acceptance."[96] Indeed, the Federal Circuit added, "the argument makes no sense, since one reason for this standard 'use and possession' provision is to enable the Government to examine and test substantially complete work before accepting it to insure that it meets the contractual requirements."[97]

The outcome in that case does not establish that acceptance invariably requires an affirmative act by the Government. FAR 46.407(g) provides that "[n]otices of rejection must include the reasons for rejection and be furnished promptly to the contractor," and expressly recognizes that untimely notice may result in acceptance being "implied as a matter of law."[98] Although these contracts incorporate the commercial-items provisions of Part 12, those provisions do not categorically displace other FAR policies.[99] Nothing in the commercial-items acceptance provision conflicts with the recognition that acceptance may, in appropriate circumstances, be implied from the Government's conduct and failure to reject promptly.

The Court of Claims applied that principle in *John C. Kohler Co. v. United States*.[100] There, the Government took possession of and operated a boiler for almost three months without formally accepting it. The court rejected the Government's

---

[96] *Id.* at 1255.

[97] *Id.*

[98] 48 C.F.R. § 46.407(g).

[99] *See* 48 C.F.R. § 12.102(c).

[100] 498 F.2d 1360, 1365–67 (Ct. Cl. 1974).

reliance on an unperformed final inspection, explaining that the Government was "in no position to complain that it did not make a final inspection."[101] Its prolonged custody and operation of the boiler constituted implied acceptance.[102] That decision does not establish that delivery alone constitutes acceptance. It does, however, establish that the Government's failure to complete an inspection or acceptance form does not necessarily prevent acceptance from occurring.

Here, for the deliveries as to which Noble has established performance without a genuine factual dispute, the Government has retained the goods or received the services without identifying a defect or rejecting performance. Noble's evidence also establishes that the DLA ordinarily validates proof of delivery, or identifies a specific deficiency, within approximately one week.[103] Despite the passage of substantial time, the Government has identified no deficiency requiring correction for these deliveries, and its unexplained refusal to validate delivery has prevented Noble from submitting invoices through the DLA system. In these circumstances, the Court concludes that the Government has impliedly accepted performance and cannot prevent the resulting payment obligations from maturing merely by withholding the administrative action necessary to permit invoicing.

---

[101] *Id.* at 1366.

[102] *Id.* at 1367.

[103] D.I. 5 ¶ 13.

### B. So long as the goods were delivered before termination, the proof of delivery may be delivered afterwards without preventing the debt from maturing.

The termination notices that the Government delivered to Noble contain the following language:

> Delivery of material after the date of this notice will not be considered for Goods Receipt posting and Proof of Delivery's indicating delivery of material after the date of this notice will not be accepted or reviewed by DLA.
>
> Excepting the above: Delivery Orders with partial performance will have their outstanding balances terminated. Any receipted balance will remain receipted, and if an invoice has not been submitted to date, Noble must invoice for the outstanding amount that has been receipted. If Noble has already submitted an invoice for that receipted balance, no further action is needed.[104]

The Government reads this language to mean that it is not required to pay in cases in which proof of delivery is received after the date of termination. That reading is incorrect. To be sure, its notice tells the contractor that it should not deliver new goods after the termination date. That is what is meant by the sentence stating that "[d]elivery of material after the date of this notice will not be considered for Goods Receipt posting and Proof of Delivery's indicating delivery of material after the date of this notice will not be accepted or reviewed by DLA." The reference to "receipted" balances preserves the invoicing process for balances already recorded. The Court therefore rejects the contention that otherwise acceptable proof of pretermination delivery is ineffective merely because Noble submitted it after termination.

---

[104] D.I. 5-1 at 191.

Nothing in the statement, moreover, suggests that the Government is not obligated to pay for goods that were delivered before the termination date. Indeed, the contrary is suggested by the statement that "if an invoice has not been submitted to date, Noble must invoice for the outstanding amount that has been receipted." The Court accordingly rejects the Government's contention that, where Noble delivered the goods before termination, and has provided acceptable proof of delivery, that the debt fails to mature because the proof of delivery was delivered after the termination of the contract.

### C. The mere declaration that proof of delivery was not acceptable, without any articulation of a reason to support the conclusion, does not prevent a debt from maturing.

For another category of invoices, the Government states that the proof of delivery was not acceptable. For these deliveries, Noble's declaration establishes that it has provided a shipper's proof of delivery to the required destination. The Government does not deny receipt, identify a discrepancy in the delivery documents, or explain any other deficiency in that evidence. Its unexplained designation of the proof as unacceptable therefore does not identify a genuine factual dispute concerning delivery.

The Government's unsupported assertion that the proof of delivery was unacceptable raises essentially the same issue as its contention that it never affirmatively accepted the goods. To be sure, had the Government come forward with a declaration that states "notwithstanding the shipper's statement that goods were delivered, we have not received the goods," this would be a different case. That circumstance would likely present a genuine dispute of fact regarding the delivery of

the goods. That would therefore be a contract dispute that is not amenable to resolution through a turnover action. But the Government has said no such thing. Rather, it essentially asserts a unilateral right to prevent a debt from maturing without taking any issue with whether the contractor has performed its contractual obligations. That is a commercially implausible result and therefore, unsurprisingly, is not supported by any of the authority to which the Government points.

### D. Noble is not entitled to turnover for deliveries where there is a genuine dispute regarding the location of the delivery.

For a final category of goods, the Government contends that the location where the shipper reports delivering the goods differs from that specified in the contract. Noble's counsel responds that delivery to a different destination would have occurred only upon the Government's written consent or direction. But Noble identifies no such authorization in the existing summary-judgment record for these deliveries. The discrepancy between the required and reported destinations therefore presents an unresolved question of contractual performance. Under the approach explained in Part III.B, Noble has not established an entitlement to turnover of those amounts.

## Conclusion

For the foregoing reasons, the Government's motion for adequate protection will be denied and its motion for relief from the automatic stay will be granted. The Court will enter summary judgment in favor of Noble, in part, and deny summary judgment, in part, on its claim for turnover. The Government will be directed (unless, of course, this Court's orders are stayed or reversed before then) to make payment to Noble on the $8,493,160.0§9 on which judgment is entered in Noble's favor by

November 9, 2026. The Government's motion to dismiss Noble's claim for breach of contract on federal sovereign immunity grounds will be granted. The parties are directed to settle forms of order so providing.

Dated: November 2, 2026

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT A

| Line | Not Terminated | Fast payment | Delivered to correct location and Proof Acceptable and Proof received before termination Date | Delivered to correct location and Proof acceptable but Proof received after Termination Date | Proof not acceptable but delivered to correct location | Dispute over delivery to correct location |
|---|---|---|---|---|---|---|
| 1 | | | $ 5,378.20 | | | |
| 2 | | | $ 5,378.20 | | | |
| 3 | | | $ 5,378.20 | | | |
| 4 | | | $ 5,011.80 | | | |
| 5 | | | $ 5,011.80 | | | |
| 6 | | | $ 5,011.80 | | | |
| 7 | | $ 14,190.00 | | | | |
| 8 | $ 513,064.24 | | | | | |
| 9 | $ 12,043.95 | | | | | |
| 10 | | | | | $ 16,384.00 | |
| 11 | | | | $ 27,403.40 | | |
| 12 | | | | $ 27,403.40 | | |
| 13 | | | | $ 87,302.82 | | |
| 14 | | | | $ 21,608.16 | | |
| 15 | | | | $ 11,279.90 | | |
| 16 | | | | | $ 160.65 | |
| 17 | | | | | $ 362,517.96 | |
| 18 | | | | | $ 1,554.48 | |
| 19 | | | | | $ 1,165.86 | |
| 20 | | | | | $ 1,165.86 | |
| 21 | | | | | $ 582.93 | |
| 22 | | | | | $ 388.62 | |
| 23 | | | $ 10,973.40 | | | |
| 24 | | | $ 9,803.90 | | | |
| 25 | | | $ 9,742.90 | | | |
| 26 | | | | | $ 1,830,625.00 | |
| 27 | | | $ 73,293.00 | | | |
| 28 | | | $ 25,620.21 | | | |
| 29 | | | $ 17,423.82 | | | |
| 30 | | | $ 9,447.45 | | | |
| 31 | | | $ 7,365.81 | | | |
| 32 | | | | $ 25,690.70 | | |
| 33 | | | | | $ 14,722.40 | |
| 34 | | | | | $ 8,536.00 | |
| 35 | | | | | $ 5,401.00 | |
| 36 | | | | | $ 4,268.00 | |
| 37 | | | | | $ 4,268.00 | |
| 38 | | | | | $ 4,092.00 | |
| 39 | | | | | $ 3,432.00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 40 | | | | | $ 3,432.00 | |
| 41 | | | | | $ 3,234.00 | |
| 42 | | | | | $ 2,700.50 | |
| 43 | | | | | $ 1,940.40 | |
| 44 | | | | | $ 1,940.40 | |
| 45 | | | | | $ 1,716.00 | |
| 46 | | | | | $ 1,716.00 | |
| 47 | | | | | $ 1,138.50 | |
| 48 | | | | | | $ 30,800.00 |
| 49 | | | | | $ 13,917.50 | |
| 50 | | | | | $ 85,922.48 | |
| 51 | | | $ 694,423.87 | | | |
| 52 | | | | $ 723,792.36 | | |
| 53 | | | | $ 45,830.57 | | |
| 54 | | $ 388.62 | | | | |
| 55 | | | | | $ 163,057.00 | |
| 56 | . | | $ 11,949.33 | | | |
| 57 | | | | $ 60,704.00 | | |
| 58 | | | | $ 39,249.94 | | |
| 59 | | | | | $ 43,780.56 | |
| 60 | | $ 16,198.60 | | | | |
| 61 | | $ 1,994.30 | | | | |
| 62 | | $ 886.82 | | | | |
| 63 | | | $ 9,961.23 | | | |
| 64 | | | $ 28,638.72 | | | |
| 65 | | | | | $ 330,047.91 | |
| 66 | | | | | $ 281,497.96 | |
| 67 | | | | | $ 151,784.79 | |
| 68 | | | $ 9,961.23 | | | |
| 69 | | | | $ 15,163.50 | | |
| 70 | | | | | $ 139,589.85 | |
| 71 | | | | | $ 3,182.79 | |
| 72 | | | | | $ 2,154.85 | |
| 73 | | | | | $ 2,032.28 | |
| 74 | | | | | $ 997.60 | |
| 75 | | | | | $ 18,914.94 | |
| 76 | | | | $ 1,575.00 | | |
| 77 | | | | | $ 0.01 | |
| 78 | | | | | $ 0.01 | |
| 79 | | | | | | $ 344,775.18 |
| 80 | | | | | $ 228,690.00 | |
| 81 | | | | $ 30,497.82 | | |
| 82 | | | | | | $ 59,165.30 |
| 83 | | | | | | $ 933,747.04 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 84 | | | | | | $ 285,574.65 |
| 85 | | | | | $ 1,266,370.20 | |
| 86 | $ 35,700.00 | | | | | |
| 87 | | | | | $ 712,056.50 | |
| 88 | | | | | $ 11,365.86 | |
| 89 | | | | | $ 2,284.06 | |
| 90 | | | | | $ 2,508.00 | |
| 91 | | | | | | $ 3,357,697.60 |
| 92 | | | | | | $ 962,784.00 |
| 93 | | | | | | $ 98,564.16 |
| 94 | | | | | $ 7,430.15 | |
| 95 | | | | | $ 972.00 | |
| 96 | | | | | $ 972.00 | |
| 97 | | | | | $ 710.74 | |
| 98 | | | | | $ 710.74 | |
| 99 | | | | | $ 646.16 | |
| 100 | | | | | $ 646.12 | |
| 101 | | | | | $ 646.12 | |
| 102 | | | | | $ 646.12 | |
| 103 | | | | | $ 44,473.94 | |
| 104 | | | | | $ 22,487.01 | |
| 105 | | | | | $ 2,845.29 | |
| 106 | | | | | $ 2,845.29 | |
| 107 | | | | | $ 2,845.29 | |
| 108 | $ 5,302.44 | | | | | |
| **Total** | **$ 566,110.63** | **$ 33,658.34** | **$ 949,774.87** | **$ 1,117,501.57** | **$ 5,826,114.68** | **$ 6,073,107.93** |

| | |
|---|---|
| **Delivery orders accepted by the government** | **$ 2,667,045.41** |

| | |
|---|---|
| **Total amount subject to turnover** | **$ 8,493,160.09** |
| **Total not subject to turnover** | **$ 6,073,107.93** |
| **Total amount at controvery** | **$ 14,566,268.02** |

**Exhibit B – Narrative explanation for chart attached as Exhibit A**

The Declaration of John S. Cuorato, Jr. included a schedule that set forth the DLA's position regarding the 108 deliveries described in Robert Albergotti's declaration.[1] In the chart attached to the Memorandum Opinion as Exhibit A, the Court identifies the 108 deliveries in the same manner as do the parties.

The Court placed each of the deliveries into one of the six groups set forth below. In grouping each of the deliveries, the Court relied on data set forth in the columns from the Cuorato Declaration labeled Terminated, Goods First Received, Proof Acceptable, and Notes. The six groups are as follows:

1. *Not terminated*. Delivery orders within this group were marked "No" under the *Terminated* column in the Cuorato Declaration. The summary judgment record sets forth no basis why amounts due in this category are not matured.

2. *Fast payment*. Delivery orders within this group were noted in the Cuorato Declaration to be on "fast payment" and scheduled to be paid by October 21, 2026. To the extent payment for these line items have not been made, the summary-judgment record provides no basis why amounts due in this category are not matured. To the extent these payments have been made, the order submitted by the parties should reduce the appropriate turnover amount accordingly.

3. *Delivered to correct location and proof acceptable and proof received before termination date*. Delivery orders are included in this group if in the Cuorato

[1] Cuorato's declaration is docketed at D.I. 19-2. Albergotti's declaration is docketed at D.I. 5.

Declaration, (a) the delivery is marked "Yes" for *Proof Acceptable*, (b) *Proof First Received* is dated before August 27, 2026, and (c) neither the *Notes* column nor the rest of the summary judgment record indicates a dispute over the delivery location. The only asserted basis for refusing delivery of these items is the Government's position that acceptance requires an affirmative act on its part. The Court rejects that argument in Part IV.A of the Memorandum Opinion.

4. *Delivered to correct location and proof acceptable but proof received after termination date*. Delivery orders are included in this group if the delivery would otherwise fall within the third category, but proof of delivery was provided after August 27, 2026. The Court addresses these deliveries in Part IV.B of the Memorandum Opinion.

5. *Proof not acceptable but delivered to correct location.* Delivery orders are included in this group if the Cuorato Declaration says "No" in the column labeled *Proof Acceptable*, but neither the *Notes* column nor the rest of the summary judgment record indicates a dispute over the delivery location. The Court addresses these deliveries in Part IV.C of the Memorandum Opinion.

6. *Dispute over delivery to correct location.* Delivery orders within this group were noted in the Cuorato Declaration to have been delivered to a location other than ordered or without prior approval. The Court addresses these deliveries in Part IV.D of the Memorandum Opinion.

The delivery orders are grouped accordingly as follows:

Lines 8, 9, 86, and 108 have not been terminated.[2]

Lines 7, 54, and 60-62 are noted to be on Fast Payment track with payment scheduled for October 21, 2026.

Lines 1-6, 23-25, 27-31, 51, 56, 63-64, and 68 are orders that are marked to have proof first received prior to August 27, 2026, and the proof is marked as acceptable by the Government.[3]

Lines, 11-15, 32,52-53, 57-58, 69, 76, and 81 are orders that are marked to have proof received after August 27, 2026, but its proof was acceptable by the Government.

Lines 10, 16-22, 26, 33-47, 49-50, 55, 59, 65-67, 70-75, 77-78, 80, 85, 87-90, and 94-107 were delivered to the correct location but the proof was not acceptable by the Government.[4]

Lines 48, 79, 82-84, and 91-93 are those for which Noble has not demonstrated that the goods were delivered to the correct location.

---

[2] The Government's note on Line 9 states that the schedule lists 3 unites while the packing slip shows 10. As Noble explains in response, however, the alleged discrepancy is illusory because it the order is a mix of physical products and training services, and the Schedule only lists the physical product, while the packing slip lists both. It is therefore subject to turnover. Line 108 is addressed in note 4.

[3] The Government's note on Lines 63 and 68 states that the same order line was billed twice with full quantity already received and invoiced. The summary judgment record shows that these orders were for two separate training courses—one was held on August 13 and 14, 2026 and the other was held on August 17 and 18 2026. D.I. 5-1, Ex. C-1 and C-2. The assertion that these are single amounts that were billed twice is therefore incorrect.

[4] The Government's note on Line 10 states that schedule amount exceeds order price of $15,009.70. Noble has agreed to a reduction in this amount. The form of order that the parties submit should reflect that adjustment. The Government notes for Lines 94-108 "in Noble's 'Delivery Aug 28 +After." The summary judgment record shows that the goods were in fact delivered before the termination date and that the Government's assertion that these were goods delivered after termination is based on the mislabeling of the folder in which the documents were located when they were produced in discovery.

Line 48 is noted in the Cuorato Declaration to have been ordered for Cannon AFB, NM but the proof of delivery shows delivery to Suitland, MD.

Line 79 is noted in the Cuorato Declaration to have been ordered for Hanahan, SC but proof of delivery states it was delivered to Camp Pendleton, CA.

Lines 82-84 and 91-93 are noted in the Cuorato Declaration to have been delivered to Fort Bragg, NC without an approved change of address request.

The opinion places the six groups of orders into three categories which are reflected in the chart as follows:

Category 1. Deliveries for orders that have not been terminated or where the Government has accepted delivery of the goods or services. This category is This category combines total amounts from groups 1-4 stated above and is reflected in cell titled "Delivery Accepted by the Government" **($2,667,045.41)**.

Category 2. Deliveries that were made to the correct location, but where the Government has not formally "accepted" the delivery but has not offered a reason for its refusal to do so. This category is reflected in the total amount of group 5 **($5,826,114.68).** Both categories 1 and 2 are subject to turnover (totaling **($8,493,160.09).**

Category 3. Deliveries that were made to a location other than the one specified in the contract, where the debtor has been unable to demonstrate on the existing record that the Government has agreed to accept delivery at that location. This category is reflected in group 6 (**$6,073,107.93).**